| | |
|---|---|
| STATE OF MAINE<br>PENOBSCOT, | SUPERIOR COURT<br>BANGOR |

DANARAE L. CONLOGUE as )
personal representatives of )
the estate of LEWIS N. CONLOGUE, )  NO. CV- 16 -95
)
Plaintiff, )
)
v. )
)
SCOTT HAMILTON, in his individual ) COMPLAINT
capacity; )
TAYLOR C. DUBE, in his individual )
capacity; )
TED MILLETT, in his individual )
capacity; )
TOM FISKE, in his individual capacity; )
Defendants. )

FILED

MAY 17 2016

PENOBSCOT JUDICIAL CENTER
PENOBSCOT COUNTY SUPERIOR COURT
BANGOR DISTRICT COURT

## I.  PRELIMINARY STATEMENT

1. The Plaintiff, DanaRae L. Conlogue, brings this civil rights and wrongful death action against the Defendants, under 42 U.S.C. § 1983, 5 M.R.S.A. § 4682, and 18-A M.R.S.A. § 2-804, for the unlawful use of excessive and deadly force against Lewis N. Conlogue on August 3, 2014 in Lagrange, Maine in violation of the Fourth Amendment of the United States Constitution, and Article One Section 5 of the Maine Constitution, which caused conscious

1

pain and suffering, and, ultimately, the death of Lewis N. Conlogue.

## II. PARTIES

2. DanaRae L. Conlogue is the wife, and personal representative of the estate of Lewis N. Conlogue, as duly appointed by the Penobscot County Probate Court, and the rightful heir of Lewis N. Conlogue under 18-A M.R.S.A. § 2-106.

3. At all times relevant to this Complaint, Lewis Conlogue was 49 years old, the husband of DanaRae L. Conlogue, and a resident of Lagrange, Maine.

4. Scott Hamilton was, at all times relevant to this Complaint, a Sergeant with the Maine State Police, and acting under the color of law as a police officer for the State of Maine; Mr. Hamilton is being sued in his individual capacity.

5. Taylor C. Dube was, at all times relevant to this Complaint, a Trooper with the Maine State Police, and acting under the color of law as a police officer for the State of Maine; Mr. Dube is being sued in his individual capacity.

6. Tom Fiske was, at all times relevant to this Complaint, a Trooper with the Maine State Police, and acting under the color of law as a police officer for the State of Maine; Mr. Fiske is being sued in his individual capacity.

7. Ted Millett was, at all times relevant to this Complaint, a Sergeant with the Maine State Police, and acting under the color of law as a police officer for the State of Maine; Mr. Millet is being sued in his individual capacity.

8. The above named Defendants Hamilton, Dube, Fiske, and Millett are collectively referred to throughout this Complaint as "the Defendant police officers."

### III. STATEMENT OF FACTS

9. On August 3, 2014, Maine State Police Sergeant Hamilton shot and killed Lewis Conlogue.

10. On August 3, 2014, at around 3:45 p.m. the Defendant police officers received information that Lewis Colonogue was parked in an abandoned restaurant parking lot on Route 16 in Lagrange, Maine.

11. The Defendant police officers learned Mr. Conlogue was threatening to commit suicide with a handgun.

12. The Defendant police officers learned Mr. Conlogue was accompanied by his wife, DanaRea Conlogue.

13. The Defendant police officers learned DanaRae Conlogue was now in a safe place and not in any danger.

14. The Defendant police officers learned Mr. Conlogue never threatened his wife or anyone else, other than to harm himself.

15. The Defendant police officers learned Mr. Conlogue was depressed because he had been unable to work due to a back injury and could not support his family.

16. The Defendant police officers knew Mr. Conlogue had committed no crime before their arrival at the scene, and throughout the course of their contact with Mr. Conlogue at the scene, and up until his death.

17. The Defendant police officers, along with other law enforcement officers, arrived at the location in Lagrange were Mr. Conlogue's car was parked.

18. Mr. Conlogue was standing beside his car holding the handgun to his head.

19. The Defendant police officers set up a perimeter around Mr. Conlogue's location.

20. Sgt. Millett arrived at the scene and became the on-scene commander.

21. Sgt. Millett was responsible for overseeing the other officers on the scene, including the other Defendant police officers.

22. The Defendant police officers were able to take a covered positions several hundred feet from Mr. Conlogue.

23. Trooper Fiske took up a covered position behind a tractor approximately 200 hundred feet from Mr. Conlogue.

24. Two other State Police Troopers took up covered positions close to Trooper Fiske and approximately 200 feet from Mr. Conlogue.

25. Trooper Dube learned Sgt. Hamilton was looking for the best vantage point to set up his precision rifle.

26. Trooper Dube believed his current location was the best place for Sgt. Hamilton to set up his rifle and switched locations with Sgt. Hamilton.

27. Trooper Dube helped Sgt. Hamilton set up the rifle and assure there was no branches or other obstructions preventing Sgt. Hamilton from taking a shot at Mr. Conlogue.

28. Sgt. Hamilton took up a position in the wood-line approximately 400 hundred feet from Mr. Conlogue.

29. Sgt. Hamilton took up a position using the trees as cover.

30. The State Police Crisis Negotiation Team were called to the scene to talk Mr. Conlogue down from hurting himself.

31. The Defendant police officers were aware the State Police Crisis Negotiation Team had arrived at the scene and were planning to talk with Mr. Conlogue to resolve the situation.

32. Trooper Fiske was able to see Mr. Conlogue through binoculars and provided the other Defendant police officers, and other officers on scene, with a description of what he saw Mr. Conlogue doing.

33. For approximately two hours, the Defendant police officers watched Mr. Conlogue, or received reports from Trooper Fisk, about Mr. Conlogue's activities.

34. During this two hours period, Mr. Conlogue would walk around the parking lot, or sit, with the gun to his head, or holding the gun down or up in the air.

35. Sgt. Hamilton never saw Mr. Conlogue point the gun at any of the law enforcement officers, or anyone else.

36. Mr. Conlogue never expressed any intent to harm the officers or anyone person other than himself.

37. The Defendant police officers learned from Trooper Fiske, or saw for themselves, that Mr. Conlogue was walking around the parking lot with the handgun pointed to his head at times, at the ground, or up in the air.

38. After some point, it appeared to Trooper Fiske that Mr. Conlogue noticed his position and the two troopers near him.

39. At one point, Mr. Conlogue was told by law enforcement to stop walking toward the road.

40. Mr. Conlogue followed the request by law enforcement and stopped walking toward the road.

41. Mr. Conlogue stopped and held his hands up.

42. Mr. Conlogue turned back away from the roadway and put the gun back to his head.

43. Trooper Fiske reported to the Defendant police officers that Mr. Conlogue had removed the magazine from his handgun and was holding the magazine up.

44. Trooper Fiske saw Mr. Conlogue put the magazine on the hood of his car and reported this to the other Defendant police officers.

45. Sgt. Hamilton could see Mr. Conlogue through the scope on his rifle.

46. Sgt Hamilton saw Mr. Conlogue remove the magazine from the handgun and place the magazine on the hood of the car.

47. Sgt. Hamilton could see Mr. Conlogue would point the gun at his own head at times.

48. Trooper Fiske told the Defendant police officers Mr. Conlogue was holding the handgun up in the air at a 45 degree angle in Trooper Fiske's direction.

49. Trooper Fiske was approximately 200 hundred feet from Mr. Conlogue at the time and protected by the cover of the tractor.

50. Later, Sgt. Hamilton learned Mr. Conlogue was no longer pointing the handgun in the direction of Trooper Fiske or any other law enforcement officer.

51. Sgt. Hamilton learned Mr. Conlogue was pointing the handgun up in the air.

52. Mr. Conlogue never pointed the gun at the officers or anyone else in the area other than to point the gun to his own head.

53. Trooper Hamilton flipped the safety off his rifle and began targeting Mr. Conlogue with his rifle.

54. Sgt. Hamilton asked where Mr. Conlogue was pointing the gun.

55. Trooper Fiske told Sgt. Hamilton the gun was pointed up in the air.

56. Sgt. Hamilton fired one shot at Mr. Conlogue.

57. Sgt. Hamilton could not see Mr. Conlogue's hands when Sgt. Hamilton fired the shot.

58. Sgt. Hamilton could not see where Mr. Conlogue was pointing the gun when Sgt. Hamilton fired the fatal shot and was last told Mr. Conlogue was pointing the gun in the air.

59. Trooper Dube was next to Sgt. Hamilton as he prepared to, and then fired, the shot.

60. Trooper Dube was aware or should have been aware that Sgt. Hamilton was planning to fire at Mr. Conlogue and did not intervene to stop him.

61. Trooper Hamilton shot Mr. Conlogue once in the back.

62. The gunshot went through Mr. Conlogue's back and he fell to the ground.

64. Mr. Conlogue was still breathing while on the ground.

65. Mr. Conlogue was aware he had been shot.

66. Lewis Conlogue was unarmed at the time he was shot and killed by Sgt. Hamilton.

67.  The magazine to Mr. Conlogue's handgun was out of the firearm at the time Sgt. Hamilton shot Mr. Conlogue.

68.  Mr. Conlogue never made any threatening movements towards the officers or anyone else.

69.  Approximately two and one half hours elapsed from the time law enforcement first arrived on the scene and Sgt. Hamilton chose to use deadly force.

70.  Sgt. Hamilton was aware the State Police Crisis Negotiation Team was on the scene and preparing to negotiate with Mr. Conlogue at the time he fired the fatal shot.

### IV.  CLAIMS FOR RELIEF

*Count One*
**Excessive Force, Pursuant to 42 U.S.C. § 1983, Fourth Amendment of United States Constitution as to Defendant Police Officers Hamilton, Dube, Fiske, and Millet.**

71.  The Plaintiff incorporates all previously alleged paragraphs as if alleged herein.

72. The Defendant police officers violated Mr. Conlogue's right under the Fourth Amendment of the United States Constitution to be free from the use of excessive and unreasonable force.

73. Sgt. Hamilton shot and killed Mr. Conlogue without legal cause or excuse.

74. Sgt. Hamilton knew, or reasonably should have known, Mr. Conlogue was not an imminent threat to himself or any other police officer, or person, present at the scene at the time Sgt. Hamilton chose to shoot and kill Mr. Conlogue.

75. Officers Fiske and Dube helped and assisted Sgt. Hamilton in his use of excessive force against Mr. Conlogue, and/or failed to intervene to prevent Sgt. Hamilton from using excessive force against Mr. Conlogue.

76. Trooper Dube was beside Sgt. Hamilton at the time he chose to fire the deadly shot.

77. Trooper Dube knew Sgt. Hamilton was preparing to use deadly force against Mr. Conlogue.

78. Trooper Dube took no steps to intervene or prevent Sgt. Hamilton from using deadly force.

79. Trooper Fiske was in communication with Sgt. Hamilton at the time he decided to use deadly force.

80. Trooper Fiske did not intervene or prevent Sgt. Hamilton from using deadly force against Mr. Conlogue.

81. Sgt. Millet was responsible for supervising the officers on scene.

82. Sgt. Millet was aware Sgt. Hamilton was preparing to use deadly force against Mr. Conlogue but failed to intervene or prevent the use of deadly force.

83. Sgt. Millet failed to supervise the Defendant police officers and assure no officer used deadly force against Mr. Conlogue unless he posed an imminent threat to the officers or another person.

84. As a result of Sgt. Hamilton shooting Mr. Conlogue, he suffered the following damages:

(a) Violation of his rights under the Fourth Amendment of the United States Constitution to be free from the use of unreasonable and excessive force.

(b) Loss of his life.

(c) Physical pain and suffering and emotional trauma and suffering.

(d) Conscious pain and suffering and fear.

(e) Medical and funeral expenses.

(f) Loss of future earnings and wages.

### *Count Two*
### Excessive Force, Pursuant to 5. M.R.S. § 4682 and Article 1 § 5 of the State of Maine Constitution as to Defendants Police Officers Hamilton, Dube, Fiske, and Millet.

85. The Plaintiff incorporates all previously alleged paragraphs as if alleged herein.

86. The Defendant police officers violated Mr. Conlogue's right under the Article 1 § 5 of the State of Maine Constitution to be free from the use of excessive and unreasonable force.

87. As a result of the above violation Mr. Conlogue suffered the damages set forth in Paragraph #84 above.

### Count Three
### Wrongful Death, Pursuant to 18-A M.R.S.A. § 2-804 as to all Defendants.

88. The Plaintiff incorporates all previously alleged paragraphs as if alleged herein.

89. The Defendants violation of Mr. Conlogue's rights under federal and state constitutional law as set forth in the previous paragraphs directly caused his death.

90. As a result of Mr. Conlogue's death, the Plaintiff seeks damages as set forth and provided under Maine's Wrongful Death Statute, 18-A M.R.S.A. § 2-804(b).

### Count Four
### Wrongful Death – Conscious Pain and Suffering Pursuant to 18-A M.R.S.A. § 2-804 as to all Defendants.

91. The Plaintiff incorporates all previously alleged paragraphs as if alleged herein.

92. Lewis Conlogue suffered a period of conscious pain and suffering after being shot by Sgt. Hamilton and before his death.

93. The Plaintiff seeks damages as set forth and provided under Maine's Wrongful Death Statute, 18-A M.R.S.A. § 2-804(c).

## VI. REQUEST FOR RELIEF

94. As a result of the above claims for relief, the Plaintiff requests the following relief:

    i. Compensatory damages;

    ii. Punitive damages;

    iii. Attorney fees and cost pursuant to 42 U.S.C. § 1988, and 5 M.R.S. § 4683;

    iv. damages as provided for under 18-A M.R.S.A. § 2-804;

    v. and all other monetary and equitable relief the Court finds appropriate.