## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| DANARAE L. CONLOGUE as personal representative of the estate of LEWIS N. CONLOGUE, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| SCOTT HAMILTON, et al., | ) ) |
| Defendants. | ) ) |

Docket no. 1:16-CV-296-GZS

## ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

Before the Court are Cross-Motions for Summary Judgment in this matter arising from the fatal shooting of Lewis Conlogue by police officer Scott Hamilton.  For the following reasons, the Court GRANTS Defendant's Motion (ECF No. 39) and DENIES Plaintiff's Motion (ECF No. 41).[1]

## I.  LEGAL STANDARD

Generally, a party is entitled to summary judgment if, on the record before the Court, it appears "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "[T]he mere existence of *some* alleged factual

---

[1] The Court GRANTS Plaintiff's Motion for Leave to File a Surresponse/Surreply (ECF No. 57) and considers Plaintiff's substantive arguments in that Motion as well as the arguments in Defendant's Response (ECF No. 58) and Plaintiff's Reply (ECF No. 60).  Generally, "[n]either the Federal Rules nor the Local Rules permits a party to file a surreply to the moving party's reply," Aero Union Corp. v. Aircraft Deconstructors Int'l LLC, No. 1:11-484-JAW, 2012 WL 3679627, at *9 (D. Me. Aug. 24, 2012), except in specific circumstances, such as "where a party has not had the opportunity to contest matters introduced for the first time in the opposing party's reply," Animal Welfare Inst. v. Martin, 588 F. Supp. 2d 70, 81 (D. Me. 2008).  However, the Court believes that considering the surresponse/surreply is warranted in this case given that Defendant, with good reason, does not object to the Court's consideration of the First Circuit's decision in McKenney v. Mangino, 873 F.3d 75 (1st Cir. 2017), which was published after briefing was concluded on the cross-motions for summary judgment in this matter, and considering that the Court's consideration of Plaintiff's substantive arguments in its surresponse/surreply does not change the Court's ultimate determination on the cross-motions for summary judgment.

dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. A "material fact" is one that has "the potential to affect the outcome of the suit under the applicable law." Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 703 (1st Cir. 1993).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the Court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. See Santoni v. Potter, 369 F.3d 594, 598 (1st Cir. 2004). Once the moving party has made this preliminary showing, the nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." Triangle Trading Co., Inc. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (quotation marks and internal ellipsis omitted); see also Fed. R. Civ. P. 56(e). "Mere allegations, or conjecture unsupported in the record, are insufficient." Barros-Villahermosa v. United States, 642 F.3d 56, 58 (1st Cir. 2011) (quoting Rivera-Marcano v. Normeat Royal Dane Quality A/S, 998 F.2d 34, 37 (1st Cir. 1993)); see also Wilson v. Moulison N. Corp., 639 F.3d 1, 6 (1st Cir. 2011) ("A properly supported summary judgment motion cannot be defeated by conclusory allegations, improbable inferences, periphrastic circumlocutions, or rank speculation."). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment for the moving party." In re Ralar Distribs., Inc., 4 F.3d 62, 67 (1st Cir. 1993).

## II. FACTUAL BACKGROUND

The following facts are undisputed, unless specifically noted.[2]  On Sunday, August 3, 2014, at approximately 3:41 p.m., DanaRae Conlogue called 911 and reported that she was with her husband, Lewis Conlogue, at the site of a shuttered restaurant on Bennoch Road in LaGrange, Maine, and that he had a gun to his head.[3]  DanaRae explained that she and Lewis had been arguing as they drove on Bennoch Road when she pulled over in front of the restaurant building.  She further explained that after she pulled over, Lewis got out of the car, told her "you don't want to see this," and put a gun to his head.  (911 Recording (ECF No. 36-3) at 12:52; Deposition of DanaRae Conlogue ("Conlogue Dep.") (ECF No. 36-4), PageID #s 163, 169.)[4]  DanaRae also told the dispatcher that she believed the gun was a 9 mm Lewis carried as a concealed weapon and that he was "very good with guns."  (911 Recording at 2:12, 7:25; Conlogue Dep., PageID # 163.)

Members of the Penobscot County Sheriff's Office and the Maine State Police responded to the scene.  The shuttered restaurant was on the east side of Bennoch Road, which runs north-south through LaGrange.  To the north of the restaurant was a parking lot bordered by rocks, some isolated trees, and then an open field.  The Conlogue vehicle was parked in front of the restaurant's entrance, which was on the building's west side, facing Bennoch Road.  Across Bennoch Road and slightly to the north of the restaurant's parking lot was a private residence surrounded by fields

---

[2] When evaluating cross-motions for summary judgment, the Court is required to "view each motion separately and draw all reasonable inferences in favor of the respective non-moving party." Roman Catholic Bishop of Springfield v. City of Springfield, 724 F.3d 78, 89 (1st Cir. 2013).  However, in presenting the narrative of facts in this case, the Court simply recites the essentially undisputed facts presented by the parties and supported by the record.

[3] In the 911 call, DanaRae Conlogue identified the restaurant by name, but there does not appear to be any dispute that the police knew that the restaurant was no longer in business and that the building was unoccupied.

[4] For the 911 call recording, the Court cites throughout to the Amended Exhibit 3 to the Joint Stipulated Record, which was submitted after the Court brought a technical issue with the first version of the exhibit to the parties' attention. (See ECF No. 59.)

and with several vehicles parked in front of it.  To the south of the restaurant was another building, which was separated from the restaurant by a line of trees.  The officers at the scene assigned a letter to each side of the site for purposes of radio communication.  The "A" side was the west-facing front of the restaurant, parallel with Bennoch Road; the "B" side was the north-facing side of the restaurant, abutting the parking lot; the "C" side was the east-facing rear of the restaurant; and the "D" side was the south-facing side of the restaurant.[5]

The incident commander, Sergeant William Birch of the Sheriff's Office, and Sergeant David Millett of the State Police established a command post to the south of the restaurant, out of Lewis's sight.  As officers arrived on the scene, Birch and Millett directed them to positions in a perimeter around the restaurant.  The purpose of such a perimeter is both to contain a potentially dangerous suspect, so he does not move to an area where he might endanger members of the public, and to keep members of the public who may be in the area away from the suspect.[6]

Maine State Police Trooper Thomas Fiske arrived on the scene at 4:17 p.m. and took a position across the road from the parking lot, behind a tractor sitting in the yard of the residence. Fiske positioned himself near another trooper, Christopher Hashey, and was later joined by a third trooper, Trevor Snow.  At the time Fiske took his position, Lewis (hereinafter, "Conlogue") was sitting on a rock at the edge of the parking lot on the north side of the restaurant pointing a handgun at his own head.  Fiske estimated his distance from the Conlogue vehicle at the front of the

---

[5] See Exhibits 1 & 2 to the Deposition of Scott Hamilton ("Hamilton Dep.") (ECF No. 36-17), PageID #s 349-50.  The Court notes that there is a slight discrepancy in how the position of the troopers across Bennoch Road is depicted on the two maps, but this discrepancy does not affect the Court's analysis.

[6] It was reported over the police radio early in the stand-off that DanaRae was safely removed from the scene.  (Trooper Fiske Cruiser Recording ("Fiske Rec.") (ECF No. 36-1) at 14:25-14:50.)  It was also reported early in the stand-off that the keys were no longer in the Conlogue vehicle because DanaRae had them in her possession.  (Fiske Rec. at 24:35-25:06.)  The 911 call recording makes clear that DanaRae removed the car keys, as well as Lewis's phone, from the vehicle, but was unable to lock it, before she walked to meet officers outside the perimeter.

restaurant to be about fifty yards.[7]  Fiske observed Conlogue through binoculars throughout the subsequent events and radioed his observations to the other officers at the scene.[8]  In order to use the binoculars effectively, Fiske needed to hold them with both hands and was thus unable to hold his firearm while he observed Conlogue.  Around 4:30 p.m., Fiske reported over the radio that Conlogue had a "silver semi-auto" pointed at his own head.  (Trooper Fiske Cruiser Recording ("Fiske Rec.) (ECF No. 36-1) at 32:14.)

Defendant Sergeant Scott Hamilton was off-duty at the time but learned about the incident from monitoring police radio traffic at his home.  Hamilton has been a state police officer since 1997 and was, on August 3, 2014, stationed with Troop E in Bangor, where he supervised eight troopers.  Since 2000, Hamilton has served on the Maine State Police Tactical Team, a unit specially trained and equipped to respond to high-risk incidents, and, since 2010, has served as one of the Team's assistant commanders.  As a member of the Tactical Team, Hamilton participates in multi-day trainings every month, which include components on the use of deadly force.  Hamilton has been trained that the role of an officer using a precision rifle in a high-risk incident includes observing the incident from a vantage point, relaying observations to other officers, and using deadly force if necessary to protect others on the scene from imminent threats of serious bodily injury.  He has further been trained throughout his career in the concept of "action beats reaction"; that is, the concept that a person who decides to use force against an officer possesses an inherent advantage due to the reaction time required before the officer can effectively

---

[7] Defendant represents that the actual distance was later measured to be 199 feet.  (Def.'s Mot. for Summ. J. (ECF No. 39), PageID # 460 n.4.)

[8] The undisputed facts are largely based on two police cruiser video recordings, which capture radio communications among the officers at the scene.  The authenticity of these videos has been stipulated to by the parties for the purposes of summary judgment.  (Joint Stipulations of Fact (ECF No. 35), PageID # 147.)  The shorter video from Snow's cruiser contains better audio detail for the period immediately preceding the fatal shooting, including audio of the statements made over a PA system.  Both videos do not provide any particularly helpful visual information.

respond to the person's action. It is thus Hamilton's training that officers must take into consideration the time it would take them to react to a sudden action by a person as they assess and respond to the threat posed by that person. From his training and experience, Hamilton is also familiar with the concept known as "suicide by cop," in which a suicidal individual threatens or uses force, up to and including deadly force, against police in an attempt to provoke the police into responding with deadly force. Based on his training and experience, Hamilton is aware that an individual attempting "suicide by cop" can be very dangerous.

After learning that Troop E officers were responding to the Bennoch Road incident, Hamilton decided to respond and traveled from his home to the scene in an unmarked police cruiser and wearing a tactical uniform. Hamilton understood that the incident involved a male who had threatened to harm himself and was holding a handgun to his head. Hamilton arrived at the scene at 4:47 p.m. and learned that Conlogue was sitting on a rock bordering the parking lot, armed with a small, semi-automatic handgun. Hamilton was not told, and at no point learned, any further details about the gun, such as the caliber or model. He was aware that semi-automatic handguns do not need to be cocked between shots and can fire multiple rounds very rapidly. Hamilton also learned the general positions of the other officers on the scene. Although he could not see Fiske and Snow's position, Hamilton understood that they were across Bennoch Road from Conlogue.[9] (See Declaration of Scott Hamilton ("Hamilton Decl.") (ECF No. 36-5) ¶¶ 24, 36; Deposition of Scott Hamilton ("Hamilton Dep.") (ECF No. 36-17), PageID # 321.)

After discussion with Birch and Millett, Hamilton contacted the Maine State Police Crisis Negotiations Team and requested that trained crisis negotiators be deployed to the scene. Based

---

[9] Although Hashey was positioned close to Fiske and Snow, it appears that Hamilton was not aware of his position and thus only considered Conlogue's potential threat to Fiske and Snow. (See Declaration of Scott Hamilton ("Hamilton Decl.") (ECF No. 36-5) ¶ 24; Def.'s Mot. for Summ. J., PageID # 455 n.1.)

on Conlogue's stationary position, it was decided to wait for the arrival of any negotiator before attempting to communicate with him. Around 5:02 p.m.,[10] Fiske reported over the radio: "He's standing up right now. . . . Gun in his left hand to his head. He looks pretty lethargic. But he is walking. He just took a few steps but he's still by the rock."[11] (Fiske Rec. at 1:04:49.) A few minutes later, Fiske reported, "He's teetering back and forth pretty good." (Fiske Rec. at 1:06:30.) Hamilton was carrying a precision rifle equipped with a magnifying scope, which he adjusted to a magnification of 16x. Upon learning that Conlogue was moving, Hamilton went to Trooper Taylor Dube's position in the tree line south of the restaurant to observe Conlogue through his magnified rifle scope. Hamilton subsequently used the scope to observe Conlogue at those times Conlogue was within Hamilton's line of sight. From this position with Dube, Hamilton could not see the rock on which Conlogue had been sitting—that is, he could not see the entirety of the parking lot north of the restaurant building—but could see the Conlogue vehicle, which was positioned in front of the restaurant with its back end facing him. Hamilton was also unable to see Fiske and Snow in their positions. However, Hamilton was able to clearly hear the radio traffic at all times.[12]

---

[10] Throughout the subsequent factual narrative, the Court generally relies on the times calculated by Defendant based on the cruiser recordings and admitted by Plaintiff. (See Def.'s Statement of Material Facts (ECF No. 40), PageID # 479 n.2.)

[11] The cruiser videos record that officers reported over the radio that Conlogue had taken up to five Xanax at some point before the stand-off began. (Fiske Rec. at 24:05.) DanaRae reported on the 911 call that Conlogue had taken four or five Xanax a half hour before she called. (911 Recording (ECF No. 36-3) at 4:41.) The Xanax issue was also mentioned over the radio after Hamilton arrived on the scene. (Fiske Rec. at 1:06:11.) Later in the stand-off, Fiske reported observing Conlogue ingest three mouthfuls of unknown pills, which could have been Xanax, other anti-anxiety medication, or pain medication. (Trooper Snow Cruiser Recording ("Snow Rec.") (ECF No. 36-2) at 51:26-54:54.)

[12] The Court notes that Hamilton describes his use of a police radio when in position with Dube as follows: "Because I was fully occupied observing Mr. Conlogue through my scope, I had Trooper Dube communicate for me over the radio. Although I cannot recall whether I was listening to radio traffic on my own radio or whether I turned off my radio and listened to Trooper Dube's radio while positioned next to him, I am certain that I could clearly hear the radio at all times." (Hamilton Decl., ¶¶ 37-38.)

Upon arriving at Dube's position, Hamilton saw Conlogue emerge from the north side of the building holding a handgun to his head, walk to his vehicle, and eventually go back behind the building and out of Hamilton's view.  Hamilton then returned to the command post and discussed the situation with Birch and Millet.  It was agreed that, due to Conlogue's increased movement, communication with him should be attempted while they awaited the arrival of any negotiator. Hamilton also called a Tactical Team member and requested that he bring the Team's armored vehicle to the scene so that any negotiator could get closer to Conlogue while remaining relatively safe.[13]

Meanwhile, around 5:08 p.m., Fiske reported over the radio: "Now he's got eyes on us. He's trying to figure out where we are. . . . He just looked 360.  He's trying to figure out where we are."  (Fiske Rec. at 1:10:35.)  Around 5:11 p.m., as Conlogue moved within the parking lot and got closer to the road, Fiske reported that Conlogue was moving "a little bit quicker now."  (Fiske Rec. at 1:13:35.)  Fiske then reported that Conlogue's "sobriety seems to have improved greatly." (Fiske Rec. at 1:14:54.)  Several minutes later, following Hamilton's discussion with Birch and Millett regarding attempting communications with Conlogue while waiting for a negotiator, Sergeant William Sheehan of the Sheriff's Office began attempting to communicate with Conlogue using the public address system in a trooper's cruiser.  Although Fiske initially found it difficult to hear communications made over the public address system, which was positioned to his south, the volume was increased and he had no difficulty hearing Sheehan after the first fifteen

---

[13] Solely to provide context for the events that follow, the Court notes that from the time the perimeter was formed around the scene until the fatal shooting, Fiske reported over the radio that Conlogue was sometimes sitting on a rock at the border of the parking lot, sometimes standing or walking; that he occasionally cried; that he occasionally approached and went inside his vehicle; that he put on sunglasses; and that he smoked cigarettes and drank from a jug of what appeared to be iced tea, all while holding the gun in one hand.

minutes.[14]  Sheehan repeatedly assured Conlogue that they were concerned about him and wanted to get him some help.  Throughout the incident, Sheehan also repeatedly asked Conlogue to put down his gun.

Around 5:26 p.m., Fiske reported over the radio: "Just be aware, he's a lot more alert than he was when he first stood up and his balance has improved considerably."  (Fiske Rec. at 1:28:32.)  Around 5:41 p.m., it was reported over the radio that Conlogue was left-handed.  Fiske then reported that Conlogue was yelling "fuck you, fuck you!" and noted, "he's definitely, uh, he's hearing what [Sheehan's] saying."  (Fiske Rec at 1:44:52.)  Around 5:56 p.m., Fiske reported that Conlogue was standing up with the gun in his left hand.[15]  A few minutes later, Conlogue retrieved an item from his vehicle and placed it in his back pocket.  Fiske was able to see the item a bit later in the stand-off and reported that it "was a big knife that he put in his back pocket that he got out of the vehicle, so he's now armed with a knife as well."  (Trooper Snow Cruiser Recording ("Snow Rec.") (ECF No. 36-2) at 17:20.)

Around 6:03 p.m., Fiske reported that Conlogue "just pointed at us over here with his finger.  He's thinking about something."  Fiske added, "He just pointed his finger in our direction like a gun and he's eyeballing us pretty hard."  (Snow Rec. at 16:32-16:50.)  Fiske then reported, "He's pointing at us again, so tell him that we're not here to hurt him.  We're not here to hurt him."  (Snow Rec. at 18:19.)  Sheehan conveyed this message to Conlogue over the PA system.  Fiske reported, "He's using his finger like a gun, and he's pointing at us.  He just said—signaled to us that he knows we're here, he can see us; he pointed at us like his finger is a gun."  Fiske further

---

[14] The parties do not appear to dispute, and the record supports, that Hamilton could hear Sheehan's statements over the PA system.  (Hamilton Decl., ¶ 49; Pl.'s Local Rule 56 Statement of Facts (ECF No. 42), PageID # 531.)

[15] It is not always clear based on the record when Conlogue had the gun to his head and when he was simply holding it.

reported that Conlogue "pointed to his own eyes then toward us and then pointed at us like his hand was a gun." (Snow Rec. at 19:07-19:35.) A few minutes later, Fiske reported that Conlogue was "still doing the same hand gestures toward us." (Snow Rec. at 22:03.) As Sheehan continued to speak to Conlogue over the PA, Fiske told Sheehan that Conlogue was "not acknowledging you at all." (Snow Rec. at 23:14.) Fiske reported that Conlogue was "telling us to shoot him in the forehead" based on gestures Fiske observed Conlogue making with his hand toward his own forehead. (Snow Rec. at 24:08.)

Meanwhile, Hamilton returned to Dube's position, where he remained for the duration of the incident.[16] Hamilton chose that position because it offered cover, concealment, and a view of the front of the restaurant. It was also a position that he could get to from the command post without being seen and potentially targeted by Conlogue.[17]

Around 6:14 p.m., Fiske reported over the radio that Conlogue was "fixated with us—he's still making the, uh, pointing to his forehead." (Snow Rec. at 27:47.) Fiske then reported that Conlogue "just pointed to every one of us [Fiske, Snow, and Hashey] and held up three fingers to let us know that he knows there's three of us over here." (Snow Rec. at 28:49.) Sheehan, at Fiske's request, assured Conlogue that if he put the gun down, "we are not gonna just rush in on you." (Snow Rec. at 30:20.) Fiske reported: "no response."[18] (Snow Rec. at 31:02.) A few minutes later, Fiske reported that Conlogue "just pointed the gun downrange, uh, north, like along the roadway." (Snow Rec. at 36:38.) Sheehan warned Conlogue: "Do not point the gun

---

[16] The Court understands that Hamilton was at the command post during the preceding sequence of events. (See Hamilton Decl., ¶¶ 41-47.)

[17] Although it is not material, the Court notes its understanding that the command post was down Bennoch Road, south of the restaurant. (See Ex. 2 to Hamilton Dep., PageID # 350.)

[18] Sheehan had asked Conlogue to acknowledge his understanding by nodding.

anywhere. . . . That is very important. . . . Do not point the gun around where you see people like me. Do not do that." (Snow Rec. at 36:52.)[19] Fiske then radioed to clarify the location of the deputy sheriff positioned to the north of Conlogue. Upon learning her position, Fiske noted that although Conlogue likely was not aware of the deputy sheriff's position, someone should warn the deputy sheriff that Conlogue was pointing the gun in her direction.

Around 6:25 p.m., Fiske reported that Conlogue was "smiling and grinning at us." (Snow Rec. at 39:13.) Snow asked Fiske to confirm to him that Conlogue was still armed, which Fiske confirmed. Snow then confirmed with Hashey that Hashey was aware that Conlogue was still armed.[20] Seconds later, Conlogue began walking toward Bennoch Road. Fiske, alarmed by Conlogue's movement, radioed to Sheehan, "Will, you gotta tell him to stop where he is, he's coming toward the road." (Snow Rec. at 40:00.) Sheehan commanded Conlogue over the PA system, "do not come toward the road," "stop where you are," and "do not come any further." (Snow Rec. at 40:05.) Conlogue eventually stopped and drew a line in the dirt near the entrance from the road to the parking lot. He pointed to the line and then to the troopers positioned across the road. Fiske reported over the radio that Conlogue had drawn "a line in the sand." (Snow Rec. at 40:23.) Sheehan assured Conlogue over the PA that nobody would cross the line.

Around 6:28 p.m., after Conlogue again started advancing toward the troopers across the road, Fiske radioed to Sheehan, "Will, tell him to stop, tell him to stop where he is." (Snow Rec. at 41:32.) Sheehan again commanded Conlogue to stop. However, Fiske reported over the radio that Conlogue "just drew another line in the sand, but this one is a little bit closer." (Snow Rec. at 41:44.) After Conlogue retreated but then again started advancing toward the troopers across the

---

[19] The Court notes that many of the statements made over the PA system are extremely difficult to hear on the cruiser recordings, but the statements recited by the Court are undisputed.

[20] It seems that these communications were not made over radio channels.

road, Fiske radioed to Sheehan, "tell him to stop where he is." (Snow Rec. at 43:37.) Sheehan commanded Conlogue over the PA: "Lewis, you need to stop where you are. Lewis, stop where you are." (Snow Rec. at 43:38.) Fiske reported that Conlogue was "still advancing toward the road." (Snow Rec. at 43:46.) Sheehan then commanded Conlogue to "put the gun down and stop." (Snow Rec. at 43:55.) Fiske reported that Conlogue had stopped and was "just challenging us; he's holding his hands up." (Snow Rec. at 43:58.) Fiske then asked Sheehan to tell Conlogue to put the gun down, and Sheehan commanded Conlogue over the PA, "put the gun down, Lewis." (Snow Rec. at 44:06.) Upon seeing Conlogue again advancing toward the road, Fiske radioed, "tell him to stop, he's coming closer!" (Snow Rec. at 44:13.) Sheehan again stated over the PA, "Lewis, I need you to stop" and "you need to stop and put the gun down." (Snow Rec. at 44:17.) From hearing Fiske's tone of voice over the radio while Conlogue was advancing, Hamilton could tell that Fiske was concerned for his safety. Roughly twenty seconds after Sheehan issued the latest commands, Conlogue turned and moved away from the road, still holding the gun. Fiske reported that Conlogue had retreated but still had the gun in his hand, held up to his temple.

For the remainder of the incident, Conlogue appeared to be fixated on Fiske, Snow, and Hashey, staring at them nearly continuously. Around 6:33 p.m., Fiske reported that Conlogue was looking at him and leaning against his vehicle, approximately fifty yards from Fiske's position, with the gun in his left hand. Because Hamilton could not see Fiske from his position, he was unable to make his own estimate of Conlogue's distance from Fiske. In shooting drills with his semi-automatic service handgun, Hamilton more often than not hits targets the approximate size of a human torso and head at a distance of fifty yards. Hamilton was aware that Fiske was

observing Conlogue in order to report his actions over the radio, and Hamilton therefore believed that Fiske was at least partially exposed to Conlogue so that Fiske could observe him.[21]

Around 6:36 p.m., Fiske radioed: "Just so everybody knows, he's got the gun in his left hand, small auto, and he's got a big knife in his rear pocket." (Snow Rec. at 49:59.) A few minutes later, Fiske asked Hamilton over the radio whether, if Conlogue advanced on Fiske, Snow, and Hashey, and they were forced to fire upon him, Hamilton was "in harm's way." (Snow Rec. at 55:41.) Hamilton (via Dube) responded in the negative. Fiske then reported that Conlogue was "still pointing at us."[22] (Snow Rec. at 56:09.) Around 6:46 p.m., Conlogue held up a magazine that was fully loaded with bullets, displayed it to the officers, and then set it down on the hood of his vehicle. Fiske reported: "He just showed us a fully loaded magazine to that handgun, held it up to us." When asked over the radio if Conlogue put the magazine back into his gun, Fiske stated, "I don't know if this is an additional [magazine]. I didn't see him take it out, so it's probably an extra one." (Snow Rec. at 1:00:13-1:00:42.) Sheehan repeatedly instructed Conlogue over the PA system to remove the magazine that was already in the gun without pointing the gun at anybody. Fiske reported, "no response." (Snow Rec. at 1:02:33.) Around 6:50 p.m., Fiske reported: "Alright, he took the mag out of the gun and put the one that was fully loaded into the gun." (Snow Rec. at 1:03:37.)

Around 6:57 p.m., Conlogue raised the gun into the air and then pointed it over the heads of the officers positioned across the road. Fiske reported: "He's bringing that gun down, it's getting dangerously close here." (Snow Rec. at 1:10:35.) During this time, Sheehan again

---

[21] Specifically, Hamilton testified that he understood that Fiske and Snow were behind "some sort of cover," but that he believed they were not "100 percent covered." (Hamilton Dep., PageID #s 327, 330.)

[22] The Court notes that a few minutes later Fiske reported, conceivably referring to Conlogue, "he's saying something to us, but I can't tell what he's saying." (Snow Rec. at 59:00.)

repeatedly instructed Conlogue to put down the gun, saying, among other things, "Lewis, it is very, very important that you put the gun down"; "Lewis, you need to put the gun down"; and "this is not a joke, you need to follow these commands. Put the gun down. Do not point it at any woodline, at any residence—do not do that. Do you understand?" (Snow Rec. at 1:11:07-1:12:03.)

Although Hamilton's view was partially obscured by the passenger cabin of Conlogue's vehicle, he could see that Conlogue was leaning over the hood of the vehicle with his weapon extended in the direction of Bennoch Road. At Hamilton's request, Dube asked Fiske over the radio: "Is he leveling it in your direction?" (Snow Rec. at 1:10:58.) Fiske responded: "No, he's just taunting us. But if it drops any lower, he's in trouble." (Snow Rec. at 1:11:01.) Shortly thereafter, Dube, at Hamilton's request, again asked Fiske where the gun was pointing. Fiske responded: "It's up over our heads, at a forty-five degree angle. It's no longer pointed at his own head." (Snow Rec. at 1:11:25.) Around 6:58 p.m., Dube, at Hamilton's request, again asked Fiske where the gun was pointing. Fiske responded: "Gun is in his left hand, it is no longer pointed at his own head. He's pointing it straight up in the air." (Snow Rec. at 1:12:13.) Upon hearing that the gun was no longer pointed in the direction of the troopers, Hamilton, who had been weighing whether deadly force was necessary to protect them, decided not to use deadly force, although he remained very concerned for their safety.[23]

Around 7:02 p.m., Fiske was asked for a status update. He responded: "He hasn't moved. Gun's still up in the air." Fiske then reported that "he just pointed at his own forehead again." (Snow Rec. at 1:15:44.) Conlogue, with the gun in his left hand, then pointed it in the direction of the troopers across Bennoch Road, at roughly a forty-five degree angle over their heads. Hamilton

---

[23] Around this time, Snow was required to leave cover in order to prevent a civilian from getting too close to the scene. Fiske observed Conlogue watching Snow and became concerned that Conlogue might shoot Snow while he was away from cover.

again observed Conlogue extend the weapon over the hood of his vehicle. Hamilton could not see Conlogue's hands or lower arms, but believed from the position of Conlogue's upper arms and shoulders that the gun was extended toward the troopers across Bennoch Road. When Conlogue extended the gun, Fiske instructed Sheehan: "Will, tell him he needs to put the gun down. He needs to put the gun down now!" (Snow Rec. at 1:17:17.) Hamilton perceived from Fiske's tone of voice that he was scared. Sheehan commanded Conlogue over the PA: "You need to put the gun down. You need to put the gun down right now!" (Snow Rec. at 1:17:23.) Hamilton heard Sheehan's commands over the PA and saw no indication through his scope that Conlogue was complying with those commands. Conlogue then began flexing his wrist, moving the barrel of the gun closer to Fiske's head, so that Fiske could see down the barrel of the gun, and then back up. As soon as Fiske asked Sheehan to tell Conlogue to drop the gun, Dube, at Hamilton's request, asked Fiske where Conlogue was pointing the gun. Fiske did not respond, causing Dube to repeat the question. Fiske then responded: "About forty-five degrees. Still over our heads. But I'm not, uh, I'm not comfortable." (Snow Rec. at 1:17:31.) Hamilton heard Fiske describe the gun as pointed at a forty-five degree angle over the troopers' heads and, approximately eleven seconds after Sheehan's command to put the gun down, at 7:04 p.m., fired a single shot at Conlogue, who fell to the ground.[24] After the shot was fired, Fiske expressed his belief over the radio that Conlogue had shot himself.

Hamilton decided to use deadly force because he believed that (1) given his threatening and escalating behavior up to that point, Conlogue seemed ready to fire his weapon at the troopers across Bennoch Road, and (2) given the direction Conlogue was pointing his loaded gun and how quickly Conlogue could adjust his aim, no one at the scene would be able to react quickly enough

---

[24] To be precise, the shot came before Fiske got out the word "comfortable."

to prevent him from shooting the troopers.[25]  At the time Hamilton fired, Dube, who was positioned a few feet to Hamilton's right, was viewing Conlogue through the unmagnified scope on his patrol rifle, and was monitoring the police radio traffic, had also concluded that Conlogue posed an imminent threat of serious bodily injury to the troopers positioned across the road and had flipped off the safety on his rifle.  If Hamilton had not fired, Dube would have momentarily fired his rifle at Conlogue.   Before Hamilton fired, Hashey could see that Conlogue was at the front of his vehicle, facing the troopers across Bennoch Road over the vehicle's hood, with his left arm forward of his face, but Hashey could not tell the direction in which the gun was pointed.  Hashey asked Fiske or motioned for him to show Hashey how Conlogue was holding the gun, and Fiske held his arm out straight, at an angle that looked just slightly above head level.  Hashey concluded that the threat was too great and that if he saw Conlogue move his hand down or outward, he would fire.  Hashey then saw movement of Conlogue's arm toward him and began to pull the trigger of his rifle; he stopped when Conlogue disappeared from his sight after being hit by Hamilton's shot.

---

[25] The parties dispute whether Hamilton knew the gun was "pointed at" the troopers across Bennoch Road.  The Court declines Defendant's request to strike Plaintiff's statement of fact that "Defendant Hamilton did not know if Lewis was pointing the gun at Troopers Fiske or Snow" (Pl.'s Local Rule 56 Statement of Facts, PageID # 535), but notes that Hamilton is clear in the cited portion of his deposition testimony that he knew the gun was pointed "in the direction of Trooper Fiske and Trooper Snow" (Hamilton Dep., PageID # 328.)  Hamilton does not claim to have based his decision to use deadly force on information that Conlogue had committed any crime, and the cruiser recordings, in which Sheehan can be heard assuring Conlogue "you have not done anything wrong, you haven't committed any crime" (Snow Rec. at 9:28; see also Fiske Rec. at 1:39:04) could suggest that the officers at the scene were not aware of any criminal conduct on Conlogue's part.  The parties do not dispute that Hamilton was not aware of Conlogue having made any threats to civilians in the area of the stand-off.  Finally, the Court notes that, contrary to Plaintiff's assertion, Hamilton's stated rationale in his declaration for using deadly force is consistent with his interrogatory answer and does not contradict either the interrogatory answer or Hamilton's deposition testimony on this point.  (See Hamilton Decl. ¶ 76 & Def.'s Resps. and Objs. to Pl.'s First Set of Interrogs. (ECF No. 36-19), PageID # 441.)

After Conlogue fell to the ground, officers on the scene approached him with ballistic shields, secured the scene, and then had EMTs render assistance.[26] The EMTs determined that Conlogue was dead.[27] He was forty-nine years old.

In May 2016, DanaRae Conlogue, as personal representative of Lewis Conlogue, filed a Complaint in state court asserting the following claims against Hamilton, Dube, Millett, and Fiske, all in their individual capacities: (1) Excessive Force pursuant to 42 U.S.C. § 1983 and the Fourth Amendment to the U.S. Constitution; (2) Excessive Force pursuant to 5 M.R.S.A. § 4682 and Article I § 5 of the State of Maine Constitution; (3) Wrongful Death pursuant to 18-A M.R.S.A. § 2-804; and (4) Wrongful Death – Conscious Pain and Suffering pursuant to 18-A M.R.S.A. § 2-804. (Compl. (ECF No. 2-3), PageID #s 19-24.) The case was subsequently removed to federal court and, on April 6, 2017, this Court dismissed the claims against Dube, Fiske, and Millett without objection. (ECF No. 25.)

## III. ANALYSIS

Defendant has moved for summary judgment on Plaintiff's Section 1983 claim[28] on the basis that he is entitled to qualified immunity, which "protects government officials 'from liability

---

[26] Although it is possible that Conlogue was still alive for some period after he was shot (see Snow Rec. at 1:18:27), Plaintiff does not appear to be raising any issue with the time it took for law enforcement to approach Conlogue after he was shot or for EMTs to render assistance.

[27] Detective Patrick Gagnon, an evidence technician from the Attorney General's Office, subsequently photographed the scene and collected physical evidence relating to the incident. Near Conlogue's body, Gagnon found a Taurus semi-automatic .22-caliber pistol. The gun was loaded to capacity with a bullet in the chamber and the safety in the "fire" position. Gagnon found a second, fully loaded magazine for the gun located between Conlogue's watchband and the underside of his wrist. Gagnon also recovered from the scene two pocket knives and one fixed-blade knife in a sheath. Finally, Gagnon observed inked writing in large letters on the inside of Conlogue's right forearm, which appeared to read: "I can't do anything right." (Declaration of Patrick Gagnon (ECF No. 36-9) ¶ 11.)

[28] Section 1983 states that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law." 42 U.S.C. § 1983.

for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). If Defendant is entitled to qualified immunity, Plaintiff's Section 1983 claim cannot proceed. Therefore, the Court begins by analyzing whether, on the undisputed facts considered in the light most favorable to Plaintiff, Defendant is so entitled.

The contours of the qualified immunity framework are well established: "We undertake a two-step inquiry in qualified immunity cases, asking (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." Ciolino v. Gikas, 861 F.3d 296, 303 (1st Cir. 2017) (quotation marks omitted). The "clearly established" inquiry

> is itself divisible into two components. To begin, the plaintiff must point to controlling authority or a consensus of cases of persuasive authority that broadcasts a clear signal to a reasonable official that certain conduct falls short of the constitutional norm. Then, the court must evaluate whether an objectively reasonable official in the defendant's position would have known that his conduct violated that rule of law.

McKenney v. Mangino, 873 F.3d 75, 81 (1st Cir. 2017) (internal citations and quotation marks omitted).

In cases involving an officer's use of deadly force, the background of controlling authority is the body of case law articulating that a person has a right to be free from the use of excessive force by law enforcement. See McKenney, 873 F.3d at 81-82; Ciolino, 861 F.3d at 303. "A police officer's use of deadly force is deemed a seizure under the Fourth Amendment, and such an extreme action is reasonable (and, therefore, constitutional) only when at a minimum, a suspect poses an immediate threat to police officers or civilians." McKenney, 873 F.3d at 81 (quotation marks omitted); see also Graham v. Connor, 490 U.S. 386, 397 (1989) (explaining that whether

the use of force violated an individual's Fourth Amendment rights is determined by considering whether the officer's conduct was "objectively reasonable"); Tennessee v. Garner, 471 U.S. 1, 3 (1985) (requiring "probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others" to justify the use of deadly force to prevent a suspect's escape). But identifying this legal background for an officer's use of deadly force does not end the inquiry because "*Garner* and *Graham* do not by themselves create clearly established law outside an obvious case." White v. Pauly, 137 S. Ct. 548, 552 (2017) (quotation marks omitted). Therefore, at the second step of the "clearly established" "prong" of the qualified immunity analysis, a court must consider whether, *faced with the particular facts of a given situation*, a reasonable officer would have known that his use of deadly force was unreasonable.

Qualified immunity "will shield an officer's objectively reasonable use of deadly force." Norton v. City of South Portland, 831 F. Supp. 2d 340, 363 (D. Me. 2011) (citing Berube v. Conley, 506 F.3d 79, 82-83 (1st Cir. 2007)). In general, "[p]olice officers are entitled to qualified immunity if reasonably well-trained officers confronted with similar circumstances could reasonably believe their actions were lawful under clearly established law." Napier v. Town of Windham, 187 F.3d 177, 183 (1st Cir. 1999). When making the determination of whether a reasonable officer would have known that his use of deadly force in a particular situation was unreasonable, courts are "comparatively generous to officers facing potential danger, emergency conditions or other exigent circumstances and [there is] a fairly wide zone of protection for the police in borderline cases." McKenney, 873 F.3d at 81-82 (quotation marks omitted). Simply put, the "calculus of reasonableness must make allowance for the need of police officers to make split second judgments—in circumstances that are tense, uncertain and rapidly evolving—about the amount of force that is necessary in a particular situation." Parker v. Gerrish, 547 F.3d 1, 9 (1st Cir. 2008).

The "ultimate inquiry [is] whether a reasonable factfinder could conclude that the defendant['s] conduct was so deficient that no reasonable officer could have made the same choices under the circumstances." Estate of Bennett v. Wainwright, 548 F.3d 155, 168 (1st Cir. 2008) (quotation marks omitted). Furthermore, the United States Supreme Court has again and again reminded courts that qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'" Pauly, 137 S. Ct. at 551 (quoting Mullenix v. Luna, 136 S. Ct. 305, 308 (2015)).[29]

Courts have discretion to decide which of the two "prongs" of the qualified immunity analysis they address first. Pearson, 555 U.S. at 236. This Court starts, and ends, its analysis with the second prong of the qualified immunity analysis. A reasonable officer in Hamilton's position could have determined that Conlogue posed an immediate threat to police officers and that, therefore, the use of deadly force was justified. Hamilton was informed, in the minutes and seconds leading up to the fatal shot, that Conlogue was pointing his gun at a forty-five degree angle over the heads of Fiske and Snow. Hamilton also saw Conlogue extend his arms in that direction. Fiske's radio reports communicated to Hamilton that Fiske was concerned about what would happen if Conlogue slightly lowered his gun. Hamilton reasonably believed that the troopers were close enough to Conlogue to be in range of his gun and also reasonably believed that Fiske at least was not under complete cover. Hamilton also knew from his training that Fiske and Snow would have little time to act to protect themselves in the event that Conlogue decided to slightly lower the angle of his gun and fire. Conlogue had been repeatedly instructed to drop his gun, including

---

[29] The Court notes that the classic Graham factors for assessing the use of deadly force, "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight," Graham v. Connor, 490 U.S. 386, 396 (1989), are not readily applicable to situations, such as the one before this Court, involving a police stand-off rather than a police pursuit of a person wanted in connection with the commission of a crime.

seconds before the fatal shot, and had not done so. Finally, other officers on the scene testified that they also believed that deadly force was necessary and did not fire shots only because Hamilton did so first. See Ciolino, 861 F.3d at 304 (noting, in denying qualified immunity in an excessive force case, that no officer on the scene other than the officer who used force testified to a belief that the suspect posed a threat of immediate danger); Norton, 831 F. Supp. 2d at 363 (noting, in a deadly force case, that one officer's decision to fire a bean bag shotgun at the decedent supported the conclusion that another officer's simultaneous use of deadly force was reasonable).

Plaintiff has not presented the Court with any case law that casts doubt on its fact-based conclusion. "While it is not necessary for the [p]laintiff to find an identical case, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" Adle v. Maine State Police Dep't, No. 1:15-CV-458-NT, 2017 WL 3902859, *12 (D. Me. Sept. 6, 2017) (quoting Mullenix, 136 S. Ct. at 308). "What counts is whether precedents existing at the time of the incident establish the applicable legal rule with sufficient clarity and specificity to put the official on notice that his contemplated course of conduct will violate that rule." McKenney, 873 F.3d at 83 (quotation marks omitted). In other words, precedent at the time of the incident must "g[i]ve the defendant fair warning that, if the facts were as the plaintiff claimed them to be, his use of deadly force . . . offended clearly established Fourth Amendment law—and an objectively reasonable officer would have realized as much." Id.

The Court is unaware of any precedent suggesting that an officer's use of deadly force is objectively unreasonable when a person points a loaded gun at a forty-five degree angle over the heads of other officers after being warned repeatedly to drop the gun. Plaintiff's attempts to distinguish or analogize to other cases are unconvincing. Most prominently, Plaintiff points to McKenney v. Mangino, recently decided by the First Circuit on appeal from this District, in which

the Circuit affirmed the district court's conclusion that an officer who used deadly force was not entitled to qualified immunity.[30]  In that case, police surrounded a suicidal, armed man at his home and engaged in a stand-off, during which the man walked in and out of his home.  Approximately five or six minutes after an officer ordered the man to drop his gun and the officer believed that the man pointed his gun at him, the man "nonchalantly" approached a police cruiser with his gun "dangling by his side."  McKenney, 873 F.3d at 79.  At that point, the officer fired two shots, killing the man.  In concluding that the officer was not entitled to qualified immunity, the district court reasoned as follows:

> Stephen [the decedent] was walking nonchalantly down the driveway with his gun dangling by his side.  Stephen never made any threats to the officers, and although Deputy Mangino believed that Stephen had briefly pointed his gun at him earlier, Stephen did not point his gun at Deputy Mangino or any of the officers in the minutes immediately preceding the shooting. Crediting Deputy Mangino's assertion that he reasonably believed Stephen had pointed his gun at him when Stephen was standing in front of the garage, that fact would not justify the use of deadly force approximately six minutes later.

McKenney v. Mangino, 2:15-CV-73-JDL, 2017 WL 1365959, at *12 (D. Me. Apr. 12, 2017).  On appeal, the First Circuit affirmed the district court and concluded that well-settled precedents gave the officer fair warning that it was not lawful to use deadly force "against an individual who was suicidal, armed, slow in gait, some distance away from the officer, and had received no commands or warning for several minutes."  McKenney, 873 F.3d at 83.  Plaintiff suggests that McKenney should control disposition of this case.  McKenney, however, is readily distinguishable.

Rather than nonchalantly walking with his gun dangling by his side, at the time Hamilton used deadly force, Conlogue was extending his arms with his gun pointed at a forty-five degree angle over the heads of other officers.  Also unlike in McKenney, in this case there was no six-

---

[30] The Court understands Plaintiff to be pointing to McKenney to illustrate the application of existing precedent—of course, the McKenney decision itself could not have provided any type of notice to Hamilton because it post-dates the incident at issue in this case.

minute gap between police warnings and the use of deadly force. Conlogue was repeatedly ordered to drop his weapon in the minutes and seconds immediately preceding the deadly shooting. The cases cited by the district court in McKenney regarding police interactions with suicidal individuals are also readily distinguishable. In Weinmann v. McClone, 787 F.3d 444, 450-51 (7th Cir. 2015), the Seventh Circuit ruled that an officer was not entitled to qualified immunity following the shooting of a suicidal man who the police officer encountered sitting in a lawn chair in his garage with a shotgun laying across his lap. In Mercado v. City of Orlando, 407 F.3d 1152, 1161 (11th Cir. 2005), the Eleventh Circuit ruled that an officer was not entitled to qualified immunity following the use of force against a suicidal man who was sitting on the floor of his apartment holding a knife to his own chest. In Glenn v. Washington Cty., 673 F.3d 864, 878 (9th Cir. 2011), the Ninth Circuit ruled that officers were not entitled to qualified immunity following the use of deadly force against a suicidal teenager who was holding a pocketknife to his own neck. None of these cases involved a person being shot while in a position to quickly shoot at police officers after being repeatedly warned to drop his weapon.

As part of its analysis of the officer's use of deadly force in McKenney, the First Circuit did state that "[a]mong other things, a suspect's physical proximity [to officers] and the speed of his movements are highly relevant to this inquiry." McKenney, 873 F.3d at 82. Plaintiff suggests that because Conlogue was across Bennoch Road from Troopers Fiske and Snow at the time Hamilton used deadly force, Hamilton did not act reasonably. But the "physical proximity" factor is not relevant in this case in the manner it was relevant in McKenney. Although Conlogue was not physically close to the troopers, it is undisputed that he was within *shooting range* of them. By making the incremental movement of lowering his gun less than forty-five degrees, he could

23

have shot at them before they had a chance to react.[31]  It is well established that "the law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect." Long v. Slaton, 508 F.3d 576, 581 (11th Cir. 2007).  As the First Circuit expressly noted in McKenney, "the *most relevant factors* in a lethal force case . . . are the immediacy of the danger posed by the decedent and the feasibility of remedial action." McKenney, 873 F.3d at 84 (emphasis added).  The Court readily concludes, on the undisputed facts, that Hamilton reasonably determined that Conlogue posed an immediate threat to the troopers when he pointed his gun over their heads, and that no other remedial action was feasible given the tense, rapidly evolving situation and the various failed attempts at deescalation that Hamilton had witnessed during his approximately two hours and fifteen minutes at the scene.[32]

Defendant has also moved for summary judgment as to Plaintiff's state law claims.[33]  The Court concludes that Defendant is entitled to summary judgment on Plaintiff's claim under the Maine Civil Rights Act ("MCRA"), 5 M.R.S.A. §§ 4681-4685, for the same reason he is entitled to summary judgment on Plaintiff's Section 1983 claim.  Berube, 506 F.3d at 85 ("The disposition of a 42 U.S.C. § 1983 claim also controls a claim under the MCRA.").  Plaintiff's two claims under the wrongful death statute, 18-A M.R.S.A. § 2-804, are governed by the Maine Tort Claims Act

---

[31] To the extent Plaintiff relies on the fact that Hamilton knew that Fiske and Snow had some amount of cover, the Court is not convinced that this meaningfully undercuts Hamilton's reasonable belief that Conlogue posed an immediate threat to their safety, especially considering that Hamilton (1) reasonably believed that Fiske was at least partially exposed in order to keep Conlogue in view and (2) knew that Conlogue had seen and pointed to Fiske and Snow.

[32] The Court recognizes the fact that a person is suicidal can cut against a decision to use deadly force, but that is not the case if the person poses an immediate threat to officers or civilians.  See McKenney, 873 F.3d at 82 ("[F]ederal courts have afforded a special solicitude to suicidal individuals in lethal force cases when those individuals have resisted police commands to drop weapons *but pose no real security risk to anyone other than themselves*.) (emphasis added).

[33] The Court proceeds to rule on the state law claims because the balance of factors does not point in favor of declining to exercise jurisdiction over these claims, and the state law claims at issue do not present complex or contested issues of state law.  See Wilber v. Curtis, 872 F.3d 15, 23-24 (1st Cir. 2017).

("MTCA"), 14 M.R.S.A. §§ 8101-8118. Jackson v. Town of Waldoboro, 751 F. Supp. 2d 263, 276 (D. Me. 2010). As this Court has previously explained, pursuant to the MTCA, "a police officer's use of force is subject to absolute immunity absent conduct so egregious as to clearly exceed any discretion the officer[] could have possessed under the circumstances." Id. (alteration in original) (quotation marks omitted); see 14 M.R.S.A. § 8111(1). For the same reasons the Court determines that Hamilton is entitled to qualified immunity on the Section 1983 claim, the Court concludes that Hamilton's "conduct cannot be said to be so egregious as to deprive" him of immunity under the MTCA. Berube, 506 F.3d at 86.[34] Finally, because Defendant is entitled to summary judgment as to all claims even considering the undisputed facts in the light most favorable to Plaintiff, Plaintiff's Motion for Summary Judgment must necessarily be denied.


## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant's Motion for Summary Judgment (ECF No. 39) and DENIES Plaintiff's Motion for Summary Judgment (ECF No. 41).

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 13th day of November, 2017.

---

[34] It is undisputed that "Plaintiff did not serve a Notice of Claim on any of the Defendants, on the Maine State Police, or on the Attorney General of Maine." (Joint Stipulations of Fact, PageID # 148.) However, because the Court concludes that Defendant is entitled to summary judgment on the claims implicating the Maine Tort Claims Act for reasons unrelated to any notice requirement, the Court need not, and does not, address Defendant's alternative argument that these claims are barred based on Plaintiff's failure to file a notice of claim.